2025 IL App (1st) 242017-U

SECOND DIVISION
February 11, 2025

No. 1-24-2017

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| MICHAEL DUFFY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | 24 CH 5798 |
| | ) | |
| GTY TECHNOLOGY HOLDINGS INC., d/b/a EUNA | ) | Honorable |
| SOLUTIONS and CITYBASE, INC., | ) | Cecilia A. Horan |
| | ) | Judge Presiding |
| Defendants-Appellees. | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Howse concurred in the judgment.

**ORDER**

¶ 1    *Held:* Vacated and remanded. Court erred in compelling parties to arbitration. Question of fact existed regarding noncompete agreement that contained arbitration clause.

¶ 2    Plaintiff Michael Duffy sought a declaratory judgment that he was not obligated to arbitrate a dispute with his employer. The court disagreed and compelled arbitration. For the reasons below, we vacate that order and remand for a hearing to determine whether the arbitration clause is enforceable.

¶ 3    Duffy is the founder and former CEO of CityBase, Inc. Around 2018, Duffy began negotiating the sale of CityBase to GTY Technology Holdings Inc. ("GTY"). The parties

negotiated a deal in which Duffy would sell his business but remain as an executive vice president and chief operating officer of CityBase.

¶ 4    The terms of this deal were first memorialized in an Offer of Employment letter dated September 12, 2018 (the "2018 Offer Letter"). Among its provisions, paragraph 7 provided that, as "material inducement" for the employment relationship between the parties, Duffy "agree[s] to execute and comply with the Fair Competition Agreement attached hereto as Exhibit A."

¶ 5    In paragraph 12, the parties expressly incorporated the "Fair Competition Agreement" (plus a third agreement regarding incentives, not relevant here) into the 2018 Offer Letter. Paragraph 12 also provided that the 2018 Offer Letter, including the incentive agreement and the Fair Competition Agreement, "constitutes the entire agreement and understanding between the parties as to the subject matter herein and supersedes all prior or contemporaneous agreements whether written or oral."

¶ 6    As indicated above, the "Fair Competition Agreement," which we shorthand to the "2018 FCA," was attached to the 2018 Offer Letter. It was essentially a noncompete and confidentiality agreement that restricted Duffy from using CityBase's trade secrets to compete with GTY or CityBase. Relevant here, paragraph 21 of the 2018 FCA contained a clause requiring "final and binding arbitration" to resolve "all claims, grievances, demands, controversies, causes of action or dispute of any nature whatsoever." The scope of this arbitration clause included arbitrating a dispute over "the arbitrability of any claims under or relating to this Agreement." In other words, the arbitration clause allowed the arbitrator to determine whether a claim was properly before the arbitration panel in the first place.

¶ 7    Both the 2018 Offer Letter and 2018 FCA were executed in September 2018.

¶ 8      But on February 14, 2019, GTY tendered a revised Offer of Employment letter (the "2019 Offer Letter") that modified a few terms of Duffy's employment. This 2019 Offer Letter contained the same paragraph 7, stating that a Fair Competition Agreement was attached. Critically, however, no such noncompete agreement—not the 2018 FCA executed in September 2018 or any other version—was attached as an exhibit.

¶ 9      To complicate matters, the 2019 Offer Letter also included the same paragraph 12 integration language: that the 2019 Offer Letter, including the Fair Competition Agreement that was supposed to be attached, "constitutes the entire agreement and understanding between the parties as to the subject matter herein and *supersedes all prior or contemporaneous agreements whether written or oral*." (Emphasis added.) This 2019 Offer Letter was executed, the sale and merger thus consummated, on February 19, 2019.

¶ 10     But by late 2023, the relationship had soured. According to defendants, in September 2023, GTY's CEO approached Duffy about fully integrating CityBase into GTY. It does not appear Duffy took kindly to this offer. GTY claims that, instead of helping to integrate the company, "Duffy engaged in a pattern of insubordination," including trying to thwart the merger and actively stoking discontent among the employees. Eventually, according to GTY at least, Duffy formulated an exit plan that included "his flight to a competitor and executing his scheme to take with him valuable assets and employees." (Duffy claims he was fired; GTY says he quit; for our purposes here, the cause of the rift and who did what is irrelevant.)

¶ 11     Defendants here, GTY and CityBase, initially sued Duffy and the others allegedly involved in the "scheme," seeking monetary damages. Among other things, they sought to compel Duffy to arbitrate this dispute based on the 2018 FCA. (This case has since been nonsuited and is not before us.)

¶ 12 That led to this complaint; shortly after the first lawsuit, Duffy sued defendants, seeking a declaratory judgment that "the 2018 FCA, including the arbitration clause of the 2018 FCA, is unenforceable." Duffy argued that, though the 2019 Offer Letter referenced and *purported* to incorporate a Fair Competition Agreement as an exhibit to the agreement, no such noncompete agreement was attached—not the 2018 FCA or any other version. And the 2019 Offer Letter revoked and superseded all prior agreements, which logically would include the 2018 FCA that contained the arbitration clause. Thus, he argued, no valid arbitration clause existed.

¶ 13 Defendants responded that Duffy's attempt to invalidate the arbitration clause was, itself, subject to mandatory arbitration, as the question of arbitrability was to be decided in the first instance by the arbitrator. They claimed that the 2018 FCA remained in force, as the parties clearly referenced it and incorporated it into their 2019 Offer Letter, if they failed to attach the document as an exhibit. Defendants also moved to compel arbitration.

¶ 14 On September 9, 2024, the court held argument (not an evidentiary hearing) on the motion to compel arbitration, among other things. The court concluded that, because the parties executed only one "fair competition agreement" over the course of their negotiations—the 2018 FCA—the parties must have intended to incorporate *that* agreement into the 2019 Offer Letter. The 2018 FCA was thus enforceable, as was its arbitration clause. Thus, "the claims that were identified in the FCA should be sent to arbitration."

¶ 15 The next day, the court entered a written order granting defendants' motion to compel arbitration and staying the action pending resolution of the parties' arbitration.

¶ 16 Duffy appealed the court's order per Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017). See *Salsitz v. Kreiss*, 198 Ill. 2d 1, 11 (2001) (order compelling arbitration "is injunctive in nature and subject to interlocutory appeal under paragraph (a)(1) of [Rule 307]."); *Craine v.*

*Bill Kay's Downers Grove Nissan*, 354 Ill. App. 3d 1023, 1025 (2005) (same).

¶ 17    On January 17, 2025, this court entered a Stay of the circuit court's order and prohibited the parties from engaging in arbitration pending the outcome of this appeal.

¶ 18    This appeal raises two issues. First, the parties disagree as to whether the enforceability of the arbitration clause in the 2018 FCA should be decided in the first instance by the court or the arbitrator. Second, obviously, on the merits, they disagree on the enforceability of the 2018 FCA and thus of its arbitration clause.

¶ 19    The first question is not close. Parties are free and, indeed, encouraged to include arbitration clauses in their contracts. *Tortoriello v. Gerald Nissan of North Aurora, Inc.*, 379 Ill. 2d 214, 225 (2008). They may decide the governing law for the arbitration as well. *Id*. Here, the 2018 FCA's arbitration clause provided that "the Federal Arbitration Act shall govern the interpretation" of the agreement.

¶ 20    Defendants are correct that, in addition to all other conceivable disputes, federal arbitration law allows the parties to contractually delegate the question of arbitrability itself to the arbitrator. *Henry Schein, Inc. v. Archer and White Sales, Inc*., 586 U.S. 63, 69 (2019). When they do, "a court possesses no power to decide the arbitrability issue." *Id*. At bottom, say defendants, the dispute here boils down to whether the arbitrator is entitled to hear this dispute, a question of arbitrability.

¶ 21    But that puts the cart before the horse. An arbitrator may resolve the arbitrability question only if the parties *contractually agreed* to delegate that question to the arbitrator. And that presupposes the parties have a valid, enforceable arbitration clause. Duffy says they don't. He claims the 2018 FCA was superseded by the 2019 Offer Letter and its integration clause. If he is right, there *is* no arbitration clause, and thus no basis for arbitration of any dispute whatsoever,

much less the initial arbitrability question. Whether a binding contract exists in which the parties agreed to arbitrate is a question of contract law for the court. See *Coinbase, Inc. v. Suski*, 602 U.S. 143, 150 (2024) ("whether the parties agreed to send the given dispute to arbitration \*\*\* must be answered by a court."); *Henry Schein*, 586 U.S. at 69 ("before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists.").

¶ 22     So the court, not an arbitration panel, is the proper forum for determining whether the 2018 FCA (and the arbitration clause contained within it) remained a binding agreement or whether it was superseded by the 2019 Offer Letter.

¶ 23     With the court's role in this affair clarified, next up is the question of the enforceability of the arbitration clause, meaning the enforceability of the 2018 FCA in which it was contained. It is a question of contract construction we review *de novo*. *Valerio v. Moore Landscapes, LLC*, 2021 IL 126139, ¶ 20.

¶ 24     In interpreting contracts, we strive to give effect to the parties' intent. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). That starts with the plain language; if unambiguous, it must be given its ordinary meaning. *Id*. But if the language is indefinite or may be reasonably read in more than one way, it is ambiguous, and we resort to extrinsic evidence to determine the parties' intent. *Id*.; *Loyola Academy v. S & S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 272 (1992).

¶ 25     The facts are rather straightforward. Again, the parties executed the 2018 FCA, which included the arbitration clause, in September 2018. That noncompete agreement was incorporated into, and attached as an exhibit to, the 2018 Offer Letter, executed on the same day. But then the parties wanted to change some of the terms of the agreement and executed a revised 2019 Offer Letter. Like its predecessor, the 2019 Offer Letter purported to attach "the Fair Competition Agreement" as an exhibit. But this time, it did not.

¶ 26     The 2019 Offer Letter's paragraph 7, referencing the Fair Competition Agreement, was identical to the one in the 2018 Offer Letter. That is, just like its predecessor, the 2019 Offer Letter incorporated "the Fair Competition Agreement" and purported to attach it as an exhibit to the agreement (note that the "Company" means GTY, and "you" refers to Duffy):

> "As a material inducement for the Company to agree to enter into an employment relationship with you on the terms set forth herein, you agree to execute and comply with the Fair Competition Agreement attached hereto as Exhibit A."

¶ 27     The 2019 Offer Letter's paragraph 12 read in pertinent part as follows:

> "This offer letter, together with the Incentive Plan, any equity award agreements referenced herein and the Fair Competition Agreement, *constitutes the entire agreement* and understanding between the parties as to the subject matter herein and supersedes all prior or contemporaneous agreements whether written or oral. *This offer letter supersedes in its entirety that certain offer letter between you and the Company dated as of September 12, 2018*." (Emphases added.)

¶ 28     These are the two relevant provisions for purposes of our appeal. The circuit court ruled that, in paragraph 7, when the parties referenced "the Fair Competition Agreement," they could only have meant the 2018 FCA, as that was the only such agreement that the parties drafted or even discussed drafting during the negotiations.

¶ 29     We are less certain. For one thing, the underlying factual premise—that the 2018 FCA was the only noncompete agreement the parties contemplated or executed—has not been established. It may ultimately be true. But there is no foundation in the record for that conclusion. There has not been any evidence offered on that point. There has been no presentation of evidence, period. This matter was summarily decided on the papers, and no

substantive affidavits or deposition testimony were attached to those papers. Nor did Duffy concede or stipulate to that fact. It remains a disputed question of fact.

¶ 30    And in terms of the language itself, there is reason for pause. Paragraph 7, quoted above, requires that Duffy "execute" the fair competition agreement. As Duffy notes, why would the parties require him to "execute" an agreement he had already executed in September 2018? We agree with Duffy that there would have been many other ways to write this language if they were referencing a pre-existing, executed document. For example, they could have identified it by the date of its execution ("the Fair Competition Agreement executed on September 12, 2018") and simply required him to comply with it or acknowledge its enforceability.

¶ 31    Then there is paragraph 12, the portion of which we quoted above, which states in no uncertain terms that the 2018 Offer Letter is superseded "in its entirety," which must include any exhibit attached to that letter, such as the 2018 FCA.

¶ 32    On the other hand, to defendants' point, paragraph 7's reference to "*the* Fair Competition Agreement" instead of "a" fair competition agreement, its capitalization suggesting it was a proper noun, and the fact that it was the *identical name* of the 2018 FCA, is evidence that everyone understood the reference to be to the 2018 FCA. And if they had agreed to a new version of that noncompete language, wouldn't they have gone to some length to make that clear? After all, in paragraph 12, they made a point of specifically superseding the 2018 Offer Letter in its entirety. That language was arguably redundant given the broad integration language in the preceding sentence. If they were willing to go the extra mile to make clear they were abrogating the earlier offer letter, wouldn't they have done the same to be clear that they were ripping up the old fair competition agreement and introducing a new one?

¶ 33    Reasonable arguments on both sides. But we are in no position to pick a winner. This may be much ado about nothing; the circuit court's take may ultimately be the correct one—the "Fair Competition Agreement" in paragraph 7 meant the 2018 FCA. Or maybe the evidence will show that the parties sought to renegotiate that language at the same time they revised the offer letter—emails, witness testimony, redlined drafts, and the like showing that the parties no longer agreed to the 2018 FCA.

¶ 34    The long and short is we have no way of knowing with any degree of confidence what the parties intended by their incorporation of "the Fair Competition Agreement" in paragraphs 7 and 12 of the 2019 Offer Letter. And though the circuit court chose the most likely explanation, the court had no concrete facts on which to base that conclusion. The meaning of that phrase is ambiguous, and extrinsic evidence is necessary to determine the parties' intent; it cannot be decided in summary fashion. *Thompson*, 241 Ill. 2d at 441; *Loyola Academy*, 146 Ill. 2d at 272.

¶ 35    Counsel for Duffy, at the hearing below, made this very point, noting that GTY "wants us to just assume with no factual record whatsoever that what the parties intended was to just carry over the document from one [agreement] to another. There's just simply no indication. If that was the case, where is their declaration that says that's what was intended?"

¶ 36    The circuit court referred that question to counsel for GTY, who argued that a motion to compel was a summary proceeding, which in his view obviated the need for an affidavit or evidence. There was "no need for an affidavit or a declaration" because the 2018 FCA contained a binding arbitration clause, and Duffy's challenge to the validity of the 2018 FCA was nothing but an "affirmative defense" that "should be sent to arbitration for the arbitrator to decide in the first instance."

¶ 37     We cannot agree with GTY's position. As we discussed above on the first issue, the court, not an arbitrator, must decide a disputed question as to the validity and enforceability of a contract before it will enforce an arbitration clause contained within that disputed contract. And given the existence of an ambiguity in the 2019 Offer Letter, deciding that question here will require more than a "summary proceeding."

¶ 38     The judgment of the circuit court is vacated. The cause is remanded for further proceedings to determine, via extrinsic evidence, the parties' intent as discussed herein and to otherwise determine the enforceability of the 2018 FCA.

¶ 39     We dissolve the Stay we entered, as the matter is back in the trial court's hands. But it should be obvious from what we have held above that it would be improper for the parties to proceed to arbitration until the circuit court has resolved whether a valid and enforceable arbitration clause even exists. We trust the experienced and able trial judge will ensure as much, however she deems appropriate.

¶ 40     Vacated and remanded with instructions; Stay dissolved.